# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs September 9, 2014

## STATE OF TENNESSEE v. RENITA ELAINE McDONALD

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-189    Mark J. Fishburn, Judge**

_____

**No. M2013-02666-CCA-R3-CD - Filed November 21, 2014**

_____

Defendant, Renita Elaine McDonald, was convicted by a Davidson County jury of theft of property valued at $1,000 or more but less than $10,000.  As a result, the trial court sentenced her to eight years as a Range II, multiple offender, and denied all forms of alternative sentencing.  After the denial of a motion for new trial, Defendant appeals, challenging the trial court's decision to exclude testimony on the basis that it constituted hearsay, the sufficiency of the evidence as to the value of the property taken, and the denial of alternative sentencing.  After our full review, we determine: (1) that the trial court did not err in allowing nontestimonial statements offered by a security officer from another officer while in pursuit of a shoplifter; (2) that the evidence was sufficient to support the conviction of theft of property valued at  $1,000 or more but less than $10,000 where the testimony of the store's loss prevention supervisor regarding identity and value was accredited by the jury; and (3) that the trial court's denial of alternative sentencing was appropriate.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Richard C. Strong (on appeal), Nashville, Tennessee; and Robert Vaughn (at trial), Nashville, Tennessee, for the appellant, Renita Elaine McDonald.

Robert E. Cooper, Jr., Attorney General and Reporter; David Findley, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Dina Shabayek, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

The proof at trial consisted of one witness, Dillard's Loss Prevention supervisor, Travis Smith. On March 5, 2011, Mr. Smith was working at the Dillard's department store in the Green Hills Mall. At the time, the store's second floor was undergoing renovation. The store was equipped with approximately twenty-five surveillance cameras. The cameras could be tilted, panned, zoomed and could move 360 degrees. There were no cameras outside the store.

Mr. Smith testified that there are approximately fifteen ways to exit the store. He stated that in his experience, two people working together as a team to steal merchandise usually had "someone who is walking [and] looking out." The lookout also helps select merchandise, and sometimes they split up "hoping that you [will] go for one and not the other, so you don't get both [of] them." He stated there are "little stairwells, emergency exit [and] stuff like that you can [use] if say one person leaves with the merchandise [and] the other person can go away and get a car and pull around to where the other person [is] left. They do that, or meet up elsewhere."

At the time Defendant entered Dillard's, Mr. Smith was in the control room monitoring the surveillance cameras whenhe observed Defendant with a black male walking in the store via the second level garage entrance near the lingerie department. He recognized Defendant from a previous occasion. Mr. Smith noticed that it appeared the male subject was looking around "seeing where the associates were [and] if anybody was watching them, who was in the area, [and] where the customers were." He thought that was "kind of peculiar." He observed the pair looking at handbags.

At some point, Mr. Smith zoomed in on the pair with a camera and observed "a few more indicators" that something unusual was happening. He radioed another security officer to perform a walk through. Mr. Smith continued to observe Defendant and the male subject as they made their way to the Brahman's handbag section, which was about fifteen to twenty feet away from the mall entrance door. He also observed a lanyard with a set of keys in Defendant's possession.

Mr. Smith watched as the male subject took wallets and put them into a purse that he had set on a table. Mr. Smith then radioed the other security officer to hurry up because he believed the store was about to experience a theft. According to Mr. Smith, at some point Defendant handed the male subject a purse. The male subject then left the store with "all the purses on his arm, including the one that he had put the wallets in and the purse that

-2-

[Defendant] had given to him."

At that point, Defendant went back through the store the way she and the male subject entered. Mr. Smith then began pursuing the male subject in the mall area outside Dillard's. At some point the male subject got onto an elevator and eluded Mr. Smith. Mr. Smith went down a fire stairwell and chased the male subject until the suspect began to head toward the traffic.

During this pursuit, Mr. Smith was in radio commination with Officer Cartonel, another security officer. Officer Cartonel had positioned himself on the second floor of the parking garage where he could see the male suspect's direction of travel. Officer Cartonel had lost sight of the male but advised Mr. Smith of the description of a silver Magnum vehicle.

After being advised by Officer Cartonel that Defendant was walking toward Walgreens across the street, Mr. Smith went into the Walgreens and found Defendant looking at candy bars. Mr. Smith identified himself and began questioning Defendant about the male subject and the theft from Dillard's. Defendant denied knowing the male subject and any involvement in the theft. She admitted to saying "hi" to the gentleman but claimed to know nothing else of the matter. Mr. Smith noticed that Defendant no longer had the lanyard and keys in her possession.

Mr. Smith testified the total value of the property taken from Dillard's was $2,120. He further testified that one purse was recovered across the street. Four purses and three wallets were not recovered. As a result of the recovered purse, on cross-examination he modified the amount of the lost property, stating, "Dillard's was out $1,825."

The State concluded its case in chief by publishing to the jury the surveillance video captured inside Dillard's, which clearly corroborated Mr. Smith's testimony regarding Defendant's and the male's activities while in the store. Mr. Smith identified Defendant as the female in the video. The store surveillance video was admitted without objection.

On cross-examination, Mr. Smith confirmed there were no "tag switches" or "booster bag" used. He stated that the male subject displayed clues that drew his attention to him. He testified regarding the store's system of keeping track of the purses in the area where Defendant and male subject were located. He confirmed he never saw Defendant leave the store with any merchandise. He testified that he signed the affidavit of complaint which stated that he observed two individuals taking tags off of purses but admitted that was not correct. Further, the affidavit stated that mall security followed the male subject across the

street, which was also incorrect.

In response to a question by defense counsel, Mr. Smith responded that he received "radio traffic from mall security" which informed him that they had "seen a silver Magnum pull in to the strip lot and [Defendant] get out of the vehicle and the gentleman get into the vehicle and the vehicle take off." He also responded to defense counsel that he was informed by a security officer that [Defendant] "was walking toward Walgreens, which is why I went towards Walgreens." He later clarified that mall security advised him that the gentleman was "standing there with the handbags. [A] Silver Magnum pulls up, [Defendant] gets out, the gentlemen throws the handbags into the vehicle, and he takes off in the vehicle and she takes off walking towards Walgreens." Mr. Smith confirmed he did not see this activity but was advised of this information by someone else and responded to the received information by going to Walgreens.

The cross-examination of Mr. Smith was concluded with his statement that he saw the white purse which Defendant had picked up in the store on the arm of the male subject after the male subject left the store.

The defense presented no proof.

At the conclusion of the proof, the jury found Defendant guilty of theft of property with a value of $1,000 or more but less than $10,000. As a result, the trial court sentenced Defendant to eight years as a Range II, multiple offender, denying any form of alternative sentencing. After the denial of a motion for new trial, Defendant filed a timely notice of appeal.

*Analysis*

The following issues have been presented to this Court on appeal: (1) whether the trial court abused its discretion in allowing out-of-court statements made to Mr. Smith by other officers; (2) whether the evidence was sufficient to support the conviction of theft of property valued at $1,000 or more but less than $10,000; and (3) whether the trial court erred in denying alternative sentencing.

*I. Exclusion of Out-of-Court Statements*

On appeal, Defendant argues that the trial court erred in admitting the out-of-court statements of Mall Security Officer Cartonel to Mr. Smith because they were hearsay and also because they were testimonial statements that violated the Confrontation Clause. The State disagrees.

During the direct examination of Mr. Smith, the following exchange occurred:

[Mr. Smith]: Anyways, I continued radioing my location and where I was and where I would like Officer Cartonel to go, as far as direction and location. And I also was in contact with mall security. I was advised of a direction of travel for the subject --

[Defense Counsel]: Objection, your Honor.

[Trial Court]: Overruled.

[Mr. Smith]: And I responded to that direction of travel, which was east on the other side of Abbott Martin, which is where I was, which is the Kroger side, the bank side, et cetera, and was heading up towards the strip mall area.

So I respond that way, I let the police know. I also radioed Officer Cartonel to respond to that direction. By the time I had arrived at that location, I had gotten a further update that the subject that I was chasing --

[Defense Counsel]: Objection, Your Honor, I'm not sure I understand where these updates are coming from, and who is supposed to be making these statements. I'm just not at all certain, these are not events that Mr. Smith actually observed or saw.

[Trial Court]: I don't know what it is he's going to say either, but I'll overrule it.

[Mr. Smith]: That was from mall security, and he was just stating that –

[Defense Counsel]: Objection, your Honor.

[Trial Court]: Overrule that, it's not being offered for the truth of the matter, asserted, it's just to explain what he may be doing now.

During the cross-examination of Mr. Smith, the following exchange took place:

[Defense Counsel]: Okay. And then you, based upon conversations, figured out that [Defendant] had gone to the Walgreens, right?

-5-

[Mr. Smith]: That is correct, they had described what had occurred to me over the radio, that [Defendant]

[Defense Counsel]: Don't tell me what somebody else said, that's okay. But you went --

[Counsel for the State]: Well I mean, he asked.

[Trial Court]: Yeah, just respond to the question. Again, it's not offered for the truth of the matter, it's to explain mentally his state of his mind where he went and why he did what he did.

[Defense Counsel]: Well, you saw her at Walgreens, you walked in and spoke with her?

[Mr. Smith]: Well, can I answer your question?

[Defense Counsel]: Well go ahead, yeah.

[Mr. Smith]: I received radio traffic from mall security, as I stated, they were at a higher vantage point than I was and could see over the tops of the buildings and into the parking lots. They had seen a silver Magnum pull in to the strip lot and [Defendant] get out of the vehicle and a gentleman get into the vehicle and the vehicle take off, and said that she was now walking towards Walgreens, and that's why I went towards Walgreens.

[Defense Counsel]: Okay. Now, you didn't see any of that, right?

[Mr. Smith]: No, sir, I did not.

[Defense Counsel]: Okay. And you're not telling us, as a matter of accuracy, that's what happened, right?

[Mr. Smith]: That is correct, sir.

[Defense Counsel]: Okay. And so somebody was in a silver Magnum and she was in a silver Magnum; is that a fair statement?

[Mr. Smith]: Could you rephrase the question, I'm not quite sure I understand it.

[Defense Counsel]: There was [Defendant] and another individual in a silver Magnum? Is that what you're telling us?

[Mr. Smith]: No, no. I'm saying that it had pulled up in front of Domino's Pizza, the gentleman, they were saying get up to Domino's Pizza, the gentleman is standing there with the handbags. Silver Magnum pulls up, [Defendant] gets out, the gentleman throws the handbags into the vehicle, and he takes off in the vehicle and she takes off walking towards Walgreens. And so then they changed, said we need to get up towards Walgreens, and I was already headed in that direction.

[Defense Counsel]: Now that's important, that is important, okay. You didn't see that?

[Mr. Smith]: No, sir, I did not.

[Defense Counsel]: Okay. All right, somebody is going to tell us about that, right, okay?

[Mr. Smith]: Not that I'm aware of.

[Defense Counsel]: No?

[Mr. Smith]: The person who saw it is not residing in the State of Tennessee currently.

[Defense Counsel]: And you can't testify to it, right?

[Mr. Smith]: No, sir.

[Defense Counsel]: Okay.

[Trial Court]: And again, ladies and gentlemen of the jury, that information cannot be used and weighed in this case to determine the guilt or innocence of [Defendant]. It was only provided to you so that you understand why Mr. Smith did what he did.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802

However, this Court has held that statements used to prove the effect on a listener are not hearsay:

> [A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

*State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010) (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 8.01[7], at 8-23 (5th ed. 2005)); *see generally State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App .1980) (noting that the victim's statement was not hearsay because it was offered for its effect on the hearer, the defendant, and established evidence of his motive in returning to the scene of the crime later in the day and threatening the victim).

At trial, as outlined above, Mr. Smith testified that he was receiving radio communication from other security personnel while the male subject and Defendant were making their getaways. In this case, the trial court determined that the radio communications testified to by Mr. Smith on direct examination were not hearsay because they were not offered to prove the truth of the matter asserted. We agree for the most part. Most statements were offered to explain why Mr. Smith pursued the suspects in the manner that he did and how he knew to look for Defendant at the Walgreens.

The trial court also determined that the detailed radio communications testified to by Mr. Smith on cross-examination were not hearsay because they were likewise not offered to prove the truth of the matter asserted. This is where we disagree. To the extent Mr. Smith testified that he was informed that Defendant was observed at the Domino's Pizza before next walking toward and into the Walgreens, these statements were not offered for the truth of the matter asserted. Mr. Smith recounted these statements to explain why he first headed in the direction of the Domino's and later redirected toward the Walgreens, where he found Defendant.

However, Mr. Smith's testimony that mall security saw Defendant drive up to the male suspect in a silver Dodge Magnum and allow the male to drive away in the vehicle with the stolen handbags was hearsay. These statements were offered to prove the truth of the matter asserted—that Defendant provided the male suspect with a getaway vehicle—and were not offered to show the effect on the listener, Mr. Smith. In his testimony, Mr. Smith was not explaining how he responded to radio communications about the exchange with the Dodge Magnum; he was explaining why he gave chase to the specific locations of Domino's and Walgreens. Therefore, this portion of Mr. Smith's testimony contained inadmissible

hearsay.[1]

Defendant also claims that the admission of these statements violated her right of confrontation protected by the federal and Tennessee constitutions. *See generally Crawford v. Washington,* 541 U.S. 36 (2004); *State v. Maclin,* 183 S.W.3d 335 (Tenn. 2006); *see also State v. Jessie Dotson*, No. W2011-00815-SC-DDT-DD, ___S.W.3d___, 2014 WL 4825169, at *52 (Tenn. Sept. 30, 2014) (noting that "the same standards govern both" constitutions). *Crawford* brings the Confrontation Clause to bear if a hearsay statement is being introduced to prove the truth of the matter asserted in a testimonial statement. *See* 541 U.S. at 59 n.9; *Jessie Dotson*, 2014 WL 4825169, at *52. "Thus, the threshold issue for an alleged confrontation clause violation is 'whether a challenged statement is testimonial or nontestimonial.'" *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011) (quoting *Maclin*, 183 S.W.3d at 345).[2]

Examining the historical origins of the right, *Crawford* defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." 541 U.S. at 51 (internal quotation and citation omitted). *Crawford* indicated several examples of testimonial statements, including those made in response to "police interrogations." *Id.* at 68. Recognizing an exception for some instances of police questioning, the Supreme Court has provided the following "primary purpose" test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

---

[1]The specific statements that constitute hearsay are: (1)"and a gentleman get into the vehicle and the vehicle take[s] off . . ."; and (2) "the gentleman is standing there with the handbags . . . the gentleman throws the handbags into the vehicle, and takes off in the vehicle." Both statements were made in response to questions asked on cross-examination.

[2]Because *Crawford* did not articulate a "comprehensive definition" of a testimonial statement, 541 U.S. at 68, subsequent Tennessee decisions have struggled with this question in *Crawford*'s wake. *See Maclin*, 183 S.W.3d at 345 (observing that "Courts across the country are grappling with the distinction between 'testimonial' and 'nontestimonial' hearsay and coming to different, often conflicting, results"); *State v. Franklin*, 308 S.W.3d 799 (Tenn. 2010) (stating "we will continue to define which statements are 'testimonial' only to the extent necessary to resolve the case before us"); *Parker*, 350 S.W.3d at 898 (affirming that "we will continue to define testimonial only to the extent necessary to resolve the case before us").

*Davis v. Washington*, 547 U.S. 813, 822 (2006).  Further,

> When determining a statement's primary purpose, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred."

*Dotson*, 2014 WL 4825169, at \*52 (quoting *Michigan v. Bryant*, 131 S.Ct. 1143, 1156 (2011)).

Relevant for determining "whether the statement's primary purpose is to establish or to prove past events potentially relevant to later criminal prosecutions or is to resolve an ongoing emergency or for some other purpose," we consider the following "nonexclusive list of factors":

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

*Parker*, 350 S.W.3d at 898-99 (quoting *State v. Franklin*, 308 S.W.3d 799, 813 (Tenn. 2010)).

This inquiry is significant because "[w]hen . . . the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." *Bryant*, 131 S.Ct. at 1155.  The Supreme Court has further explained the rationale of the ongoing emergency exception in this manner:

> The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than proving past events potentially relevant to later criminal prosecution.  Rather, it focuses them on ending a threatening situation.  Implicit in *Davis* is the idea that because the prospect of fabrication

in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

This logic is not unlike that justifying the excited utterance exception in hearsay law. Statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," Fed. Rule Evid. 803(2), are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood. An ongoing emergency has a similar effect of focusing an individual's attention on responding to the emergency.

*Id.* at 1157 (internal quotations, alterations, citations, and footnotes omitted). Yet, because nontestimonial statements can later become testimonial statements, trial courts must "determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude 'the portions of any statement that have become testimonial . . . .'" *Id.* at 1159 (quoting *Davis*, 547 U.S. at 829).

Identifying "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 1158. Ultimately, "whether an ongoing emergency exists is simply one [important] factor . . . that informs the ultimate inquiry" into a statement's primary purpose. *Id.* at 1160. The existence of an ongoing emergency is not dispositive. *Id.*

Although the Supreme Court has previously addressed the ongoing emergency exception in the context of questioning by police officers, the Confrontation Clause is not limited to police interrogation. It applies equally to elicited and unprompted statements, and the critical analysis focuses on the nature of the statements, not the questions, if any. *Davis*, 547 U.S. at 822 n.1. (noting that "statements made in the absence of any interrogation are [not] necessarily nontestimonial") *Id.*

We believe that the statements in the radio communications received by Mr. Smith and testified to during direct and cross-examinations were nontestimonial. When viewed objectively, the primary purpose of the information relayed to Mr. Smith by a mall security officer was to stop a crime in progress, i.e., an ongoing emergency. Although not a victim of the crime, the security officer was actively involved in the attempted apprehension of the fleeing male suspect by simultaneously narrating his observations of the suspect's whereabouts to Mr. Smith. While not actually giving chase himself, the security officer was physically present at the crime scene and in close proximity to the location of the chase. Although there was no indication that either the male suspect or Defendant possessed a weapon, it is not unreasonable to believe that these individuals posed a threat to the safety

of the surrounding public and to Mr. Smith, as the pursuing officer, be it by firearm, fleeing vehicle, or otherwise. As described by Mr. Smith, the mall and its immediate surroundings is a populated and active place with retail stores, boutiques, restaurants, banks, and busy streets. It strains logic to believe that the mall security guard, under these circumstances, was offering his comments for the purpose of providing accusatory testimony to develop the record of evidence for later use at trial. These were not formal or solemn statements made in the course of an investigation. There is nothing in the record to show that the statements were recorded and preserved to be used as evidence at a trial. The security officer was merely providing a reflexive, stream-of-consciousness narration of the male suspect's, and later Defendant's, conduct as a direct means of enabling police assistance to meet an ongoing emergency. These statements were far more like the statements made in *Davis*, 547 U.S. 813, 817-18 (finding a 911 recording of a domestic violence victim's identifying and descriptive statements to the dispatcher while the incident was still happening to be nontestimonial), than those made in *Crawford*, 541 U.S. at 39 (finding the tape-recorded statements of a witness describing a stabbing as testimonial) or *Hammon v. Indiana*,[3] 547 U.S. 813, 819-20 (2006) (finding a handwritten affidavit by a domestic assault victim describing the incident to be testimonial), or even in *Bryant*, 131 S.Ct. at 1150 (finding that a victim's statements identifying to police the man who shot him, while the victim bled on the ground at a gas station twenty-five minutes after the shooting, were nontestimonial). *But cf. Wilder v. Virgina*, 687 S.E.2d 542, 593 (Va. Ct. App. 2010) (finding that a 911 recording of a bystander's statements "providing a narrative report of a larceny in progress" was testimonial).

We conclude that admission of these nontestimonial statements was not error under the Confrontation Clause.

Furthermore, we also note that Defendant invited and failed to mitigate the errors of which she now complains. During its case-in-chief, the State was careful not to elicit any testimony from Mr. Smith about the exchange of the silver Dodge Magnum at the Domino's. However, on cross-examination, defense counsel broached the subject of Mr. Smith's knowledge that Defendant was at Walgreens. At one point, defense counsel instructed Mr. Smith not to provide any details of the radio communications, but the trial court indicated that any statements not offered to prove the truth of the matter asserted would be admissible. Subsequently, Mr. Smith gave a non-responsive answer that included the hearsay statements about the vehicle. Defense counsel did not object to this testimony afterward or ask for a curative instruction at that point. Instead, defense counsel proceeded to pose additional questions to the witness about the vehicle, which then elicited the most detailed and incriminating recollection of the statements about the vehicle exchange. Defense counsel

---

[3] *Hammon* was consolidated with *Davis*.

again failed to object after this answer was given, but the trial court provided a *sua sponte* limiting instruction shortly thereafter. Defendant is not entitled to relief now. *See State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

In any event, we find that the hearsay error and any resulting Confrontation Clause error are harmless. Failure to properly exclude inadmissible hearsay may be harmless if it is shown by a preponderance that the erroneously admitted evidence did not affect the jury's verdict. *State v. Long*, 45 S.W.3d 611, 624 (Tenn. Crim. App. 2000); Tenn. R. App. P. 36(b). "Whether error in the admission of evidence is prejudicial is gauged by the substance of the evidence, its relation to other evidence, and the peculiar facts and circumstances of the case, and whether such admission is sufficient ground for reversal depends on the facts in each case; and the appellate court will consider the record as a whole in determining the question of prejudice or reversibility." *State v. Cannon*, 254 S.W.3d 287, 299 (Tenn. 2008) (quoting *Blankenship v. State*, 410 S.W.2d 159, 161 (Tenn. 1966)). Violations of the Confrontation Clause are non-structural constitutional errors that are also subject to harmless error review. *State v. Antwain Green*, No. M2012-00234-CCA-R3-CD, 2013 WL 624128, at \*8 (Tenn. Crim. App. Feb. 20, 2013) (citing *State v. Gomez*, 163 S.W.3d 632, 648 (Tenn. 2005), *overruled on other grounds by State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007)). For this type of error, "[a]n assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Parker*, 350 S.W.3d at 902 (quoting *Coy v. Iowa*, 487 U.S. 1012, 1021-22 (1988)). The State must prove that confrontation error was harmless beyond a reasonable doubt. *Id.*

Not only do we find the evidence in this case sufficient, as discussed below, but we find it to be ample. Mr. Smith identified Defendant, with whom he was previously familiar, as the woman that he watched via security camera assisting a male counterpart in stealing purses and wallets from the department store. Mr. Smith testified, and the video footage shows, that Defendant and the male subject entered and moved about the store together, engaging in suspicious behavior that Mr. Smith, as an experienced loss prevention officer, recognized as common shoplifting techniques. Yet, Defendant is not guilty solely by association. Mr. Smith testified that he observed Defendant pick up a purse and take it to the male subject. That purse was seen by Mr. Smith in the possession of the male subject as he fled the store. This exchange is corroborated by the video footage. Although Mr. Smith's hearsay testimony about Defendant providing the male subject with a getaway vehicle further confirms their criminal partnership, we do not find that the inclusion of that evidence on

cross-examination impermissibly prejudiced the jury's decision in light of all the other evidence. After the hearsay emerged during cross-examination, the trial court gave a limiting instruction that the jury is presumed to have followed. *State v. Jordan*, 325 S.W.3d 1, 66 (Tenn. 2010) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006)).

For the reasons discussed above, we do not find that Defendant is entitled to relief on this issue.

## II. Sufficiency of Evidence

Next, Defendant claims there was insufficient proof of her identity as the person in Dillard's on March 5, 2011, and insufficient proof of the value of property taken. In other words, she challenges the sufficiency of the evidence.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"The identity of the perpetrator is an essential element of any crime." *State v. Robert Wayne Pryor,* No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr.19, 2005) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable

doubt." *Id.* (citing *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App .1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *Strickland,* 885 S.W.2d at 87 (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, "the testimony of a victim, by itself, is sufficient to support a conviction." *Id.* (citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)); *State v. Joshua Smith*, W2012-01059-CCA-R3CD, 2013 WL 6095831 (Tenn. Crim. App. Nov. 19, 2013), *perm. app. denied*, (Tenn. Mar. 17, 2014).

Mr. Smith testified that he observed Defendant pick up a purse and take it to the male subject. That purse was seen by Mr. Smith in the possession of the male subject as he fled the store. This exchange is corroborated by the video footage. Defendant was identified by Mr. Smith as the woman he observed on the surveillance video with the male subject in Dillard's. Within four to five minutes he identified her in Walgreens. At Walgreens, Defendant admitted to being in Dillard's and saying "hi" to the male subject that left Dillard's with the stolen merchandise. Mr. Smith identified Defendant in court to the jury, and the jury determined from all the relevant proof that Defendant was in fact the perpetrator. We will not disturb this finding.

Defendant also attacks the proof of value as insufficient. Value of property is defined as the fair market value of the property at the time and place of the offense, or if the fair market value cannot be ascertained, the cost of replacing the property. T.C.A.. § 39-11-106(a)(36)(A). If the value cannot be ascertained using either of these methods, the property is deemed to have a value of less than fifty dollars. T.C.A.. § 39-11-106(a)(36)(C). Tennessee Rule of Evidence 701(b) permits the owner of personal property to testify about the value of that property. *See State v. Hamm*, 611 S.W.2d 826 (Tenn. 1981); *Reaves v. State*, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975). He or she can testify about either the fair market value at the time of the offense or the replacement cost. *State v. Gene Allen Logue*, No. W1999-01795-CCA-R3-CD, 2000 WL 1843248, at *3 (Tenn. Crim. App. Dec. 15, 2000); *State v. Troy D. Ryan*, M2000-02142-CCA-R3CD, 2001 WL 1597746, at *3 (Tenn. Crim. App. Dec. 14, 2001). The fair market value of property is a question of fact for the jury. *Hamm*, 611 S.W.2d at 829.

Here, Dillard's loss prevention officer testified from his knowledge regarding the value of the items stolen sufficiently to allow a reasonable jury to conclude beyond a

reasonable doubt that the value of the property was over $1,000. There is nothing in the record to impeach this finding.

## III. Sentencing

Defendant lastly claims the trial court abused its discretion by imposing the burden of proving the appropriateness of probation on her and sentencing her to the maximum sentence.

Appellate review of sentencing is for abuse of discretion. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (extending presumption of reasonableness to determinations regarding the manner of service of a sentence). In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make on the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 706 n.41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, under *Bise*, a "sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 710; *State v. Leslie Warren Blevins*, M2013-01725-CCA-R3CD, 2014 WL 3828027, at *4 (Tenn. Crim. App. Aug. 5, 2014)

At the conclusion of the sentencing hearing, the record reflects that the trial court properly considered all the factors set out in Tennessee Code Annotated section 40-35-210. Based upon the pre-sentence report, the court found that Defendant had three prior felonies on her record and properly classified her as a Range II offender.

The trial court made extensive findings in considering enhancing and mitigating factors. The court "quit count at about fifteen" other prior convictions, going back some eighteen years. The court properly applied as mitigation that Defendant's conduct neither caused nor threatened serious bodily injury.

The trial court also properly considered all factors which must be considered in determining if an alternative sentence is appropriate. The trial judge stated his thoughts on Defendant's lack of potential for rehabilitation and ability to successfully complete an alternative sentence. He considered her mental and physical condition. Regarding her employment and educational histories, the trial judge noted that Defendant is thirty-seven years old and has "spent since 1995 stealing," rendering her work and education history "miserable." The trial judge further considered Defendant's character, social history, and her lack of community and family support. The trial court noted that Defendant had been arrested and convicted of four other charges while on bond for the current theft charge, casting a dim light on her history of compliance with Court orders. The trial court concluded by finding that confinement for Defendant is necessary to "protect society [by] restraining [Defendant] who has a long history of criminal conduct." The court recognized that the sentence imposed should be the least severe measure necessary to achieve the purpose for which it is being imposed. The record amply supports, and we agree with, all of the trial judge's sentencing findings.

Defendant complains that the trial court abused its discretion when it imposed the burden of proving the appropriateness of probation on Defendant. However, this Court has previously held that the burden is on the defendant to demonstrate that she is a suitable candidate for full probation. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996); *see* T.C.A. § 40-35-303(b) (1997). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *accord State v. Donna F. Benson*, W2001-01926-CCA-R3-CD, 2002 WL 31296110, at *6 (Tenn. Crim. App. Oct. 8, 2002). Defendant's argument is without support.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed in all respects.

_____
TIMOTHY L. EASTER, JUDGE

-17-